## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Sep 20 2016, 9:08 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Larry Crawford Thomas
Clinton, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

Robert J. Henke
Abigail R. Recker
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In the Termination of the Parent-Child Relationship of:

T.G. and A.G. (Minor Children)
And
J.B. (Mother),

*Appellant-Respondent,*

v.

The Indiana Department of Child Services,

*Appellee-Petitioner.*

September 20, 2016

Court of Appeals Case No. 61A01-1602-JT-347

Appeal from the Parke Circuit Court

The Honorable Sam A. Swaim, Judge

Trial Court Cause No. 61C01-1508-JT-83 & 61C01-1508-JT-84

**Riley, Judge.**

## STATEMENT OF THE CASE

Appellant-Defendant, J.B. (Mother), appeals the trial court's Order, terminating her parental rights to her two minor children, A.G. and T.G. (collectively, the Children).

We affirm.

## ISSUE

Mother raises one issue on appeal, which we restate as follows: Whether the trial court's termination Order is clearly erroneous.

## FACTS AND PROCEDURAL HISTORY

Mother is the biological parent of A.G., born on August 8, 2008; and T.G., born on June 18, 2011.[1] In 2013, Mother and the Children were living with T.G.'s father, Ty.G., in Montezuma, Parke County, Indiana. However, after Ty.G. committed a battery against Mother, Mother took the Children and moved in with her mother (Maternal Grandmother).[2] At the end of August of 2013, Mother was pulled over in Vigo County, Indiana, and was arrested on an

---

[1] J.G. is the biological father of A.G., and Ty.G. is the biological father of T.G. Prior to the termination hearing, J.G. consented to A.G.'s adoption, and on January 22, 2016, Ty.G.'s parental rights to T.G. were terminated. Neither father is a party to this appeal.

[2] Mother's oldest son, C.D., born on September 13, 2002, was also living with her and the Children at the time. However, at some point in 2014, C.D.'s father was awarded sole custody. It does not appear that C.D. was involved in the CHINS proceedings, and there is no indication that Mother's parental rights to C.D. have been terminated. Thus, C.D. is not a subject of this appeal.

outstanding warrant for theft regarding Ty.G.'s vehicle. When Mother was stopped and arrested, T.G. was in the vehicle. Accordingly, the Vigo County Office of the Department of Child Services (DCS) became involved. On August 20, 2013, DCS administered a drug screen, and Mother tested positive for methamphetamine and marijuana. These results were reported to the DCS office in Parke County, where Mother lived.

[5] The Parke County DCS office commenced an investigation. Between September 11, 2013, and October 28, 2013, Mother had two drug screens that were positive for methamphetamine and six drug screens that were positive for marijuana. However, because Mother and the Children were living in Maternal Grandmother's home, DCS felt that Maternal Grandmother offered "a safety net" that did not require removing the Children from Mother's custody. (Tr. p. 350). At the time DCS became involved,

> [Mother] was very stressed . . . . She was not employed. She really had limited income. She was living with [Maternal Grandmother,] and she didn't know how long that could continue. She had legal issues because of [allegedly] stealing the car . . . and so she was concerned about that. She was concerned about education.

(Tr. p. 351). Overwhelmed, Mother discussed the possibility of "giving [the Children] to the State," but DCS "discouraged that." (Tr. p. 351).

[6] Throughout November and December of 2013, Mother consistently tested positive for marijuana and had a positive drug screen for methamphetamine. Due to Mother's ongoing substance abuse, on November 13, 2013, DCS filed a

petition alleging the Children each to be a child in need of services (CHINS). On December 11, 2013, Mother admitted to the allegations in the CHINS petition, and the trial court adjudicated the Children to be CHINS. On January 31, 2014, the trial court issued a Dispositional Order, directing Mother to, in part, "contact a counselor . . . and schedule appointments to address her substance abuse, relationships, stress, and parenting" and "advise [DCS] of her appointments so that transportation can be arranged"; "complete the final test for her GED so that she may locate employment"; "arrange a meeting with the [c]ourt appointed attorney in [her] pending criminal matter in an attempt to get the matter resolved as quickly as possible"[3]; "submit to random drug screens at the request of the DCS"; and "apply for housing and follow through on the application process." (DCS Exh. 7). At this time, the Children remained in Mother's custody.

[7] From January through May of 2014, Mother had nineteen positive drug screens for marijuana. She also had a positive drug screen for methamphetamine in February of 2014. In April of 2014, DCS referred Mother for home-based case management services in order to help Mother "get on her feet" and become self-sufficient by obtaining housing and employment; to assist with her parenting skills; and to work on goals of "sober living, healthy relationships, transportation, boundaries, drug . . . education, [and] self esteem." (Tr. pp. 253, 255). For approximately two months, Mother attended meetings with her

---

[3] The evidence indicates that the theft case was ultimately dismissed.

case management provider. Then, in June of 2014, Mother began taking classes to become a certified nursing assistant (CNA), and she informed her case management provider that "she was too stressed out for services." (Tr. p. 255). At Mother's request, her home-based case management referral was put on hold. Although Mother completed her CNA class work, she realized "she did not like some of the work" and did not finalize the process to achieve her CNA certification. (Tr. p. 368). Similarly, while it appears that Mother attempted to take the test at least once, she failed to obtain her GED.

[8] During the first week of June 2014, DCS removed the Children from Mother's custody and placed them in foster care due to another positive drug screen for methamphetamine. Following the Children's removal, Mother was permitted to have supervised visitation. Mother received two, two-hour visits per week, but she cancelled or failed to show up for visits on a frequent basis, and she arrived late for numerous visits. When Mother would fail to show up for visits, it "was very hard on" the Children. (Tr. p. 264). "Some of [the visits] went fairly well[,]" but by the end, Mother was always "stressed out . . . with the [Children's] behaviors." (Tr. p. 263).

[9] Also in June of 2014, Mother underwent an assessment at the Hamilton Center, which recommended that "she have individual counseling" to address her anxiety and drug use, and "that she attend [alcohol and drug] group" sessions. (Tr. p. 363). Mother initially attended a few individual counseling appointments, but she stopped attending altogether by August of 2014. Additionally, Mother's home-based case management services resumed in

October of 2014, but Mother missed several meetings, and by November of 2014, she ceased participating. Although Mother's lack of transportation made it difficult for DCS to consistently monitor her drug usage, between June 3, 2014, and December 31, 2014, Mother had eleven drug screens that were positive for methamphetamine, and one of those screens was also positive for marijuana.

[10] In January of 2015, the Children were placed in their fifth foster home, which is where they currently reside. Throughout the CHINS case, the Children struggled with their lack of stability. A.G., in particular, would act out with destructive behaviors. The Children were afraid of being moved to another foster house, but in their current placement, they have become "very comfortable" and demonstrate less anxiety. (Tr. p. 361). A.G. began counseling in July of 2014 and disclosed that he had been physically abused by Ty.G. while living with Mother. After moving into the current foster home, T.G. was also placed in therapy because he "has difficulty regulating his emotion[s] and regulating his behavior." (Tr. p. 172). T.G. bonds too easily to strangers and has delays regarding language and communicating. In their current placement, the Children have demonstrated improvement in their behaviors and are both performing well in school. The foster parents have enrolled T.G. in a Head Start program where he receives speech therapy, and the Children are involved in sports and summer camps. The foster parents love the Children and wish to adopt them.

[11] Also in early January of 2015, Mother failed to appear for a review hearing, so the trial court issued a warrant, and Mother was arrested. At the time, Mother was not in compliance with her counseling or case management services; she was not available for all of the drug screens requested by DCS, and she had consistently been testing positive for methamphetamine. Although Mother still engaged in visitation with the Children, the DCS case workers were "concern[ed] that . . . we were really losing her." (Tr. p. 369). Accordingly, the trial court ordered her to resume counseling and to make herself available for random drug screens. At this time, Mother also resumed her participation in home-based case management services. In addition, DCS and the trial court arranged "a special drug court" for Mother, in which Mother and the DCS family case manager met with the trial court twice per month to review Mother's progress. (Tr. p. 369). Although Mother attended the drug court as required, she continued to test positive for methamphetamine. Thus, around January 19, 2015, the trial court suspended Mother's visitation with the Children, with "[t]he goal being that clean drug screens would be rewarded with increased visitation." (Appellant's App. p. 31). From January 6, 2015, through March 2, 2015, Mother had thirteen drug screens that were positive for methamphetamine.

[12] On March 9, 2015, Mother was scheduled to appear for her special drug court meeting. However, Mother's boyfriend, G.H., contacted the DCS family case manager on Mother's behalf and informed DCS that Mother would not be in attendance for drug court because she had admitted herself to a rehabilitation

facility. When Mother did not appear before the court, the DCS family case manager relayed the information she had received about Mother. The trial court issued a warrant for Mother's arrest but explained to DCS that if Mother "provided proof of inpatient rehab or rehab," the warrant would be dismissed. (Tr. p. 371). The next day, Mother contacted DCS and stated that she had intended to go to a rehabilitation facility in Lafayette, Indiana, but "it was nasty and there was a lot of drama." (Tr. p. 373). Mother indicated that she planned to try another facility, and DCS directed her to provide verification of treatment for the court. Instead, Mother moved to Illinois with G.H., and she terminated all communication with DCS. For the next three months, Mother did not participate in any services; she did not appear for drug screens; and she did not have any contact with the Children, whom she had not seen since December 31, 2014.

[13] On June 22, 2015, Mother reappeared in Parke County and turned herself in to the court. She was held in contempt and incarcerated until June 26, 2015. The day Mother was released from jail, the trial court held a hearing. Mother stated that she had completed a rehabilitation program and follow-up treatment in Illinois. She claimed that she was sober, and the DCS case manager noted that Mother "looked wonderful." (Tr. p. 378). However, when DCS attempted to verify Mother's participation in a rehabilitation program, the facilities that Mother claimed to have attended both reported that Mother had never been their patient. The trial court directed Mother to resume counseling and cooperate with DCS.

[14] DCS immediately commenced drug screens, requiring Mother to appear three times per week. Although Mother continued to live in Illinois, she appeared for drug screens as ordered. After approximately one month of clean drug screens, on July 20, 2015, Mother tested positive for methamphetamine. Mother disputed the results of the drug screen and claimed that she obtained a subsequent hair follicle test which was negative for all substances. Mother was reassessed by the Hamilton Center and was provisionally diagnosed "with polysubstance dependence." (Tr. p. 135). It was recommended that Mother attend eight drug and alcohol group sessions and that she see a psychiatrist for a medical evaluation. Mother attended only one group session and thereafter did not respond to the Hamilton Center's attempts to continue treatment.

[15] On August 28, 2015, DCS filed a petition to terminate Mother's parental rights to the Children. Approximately two months later, Mother moved back to Indiana and rented a two-bedroom house. She also obtained employment cleaning houses. Following the filing of the termination petition, Mother had two positive drug screens for marijuana and one for methamphetamine. On November 19, 2015, and December 8-9, 2015, the trial court conducted a termination hearing. By this time, Mother had not seen the Children in nearly a year. Mother testified that she had overcome her substance abuse issues. Yet, between the termination hearing dates, on December 2, 2015, Mother had another positive drug screen for methamphetamine. On January 22, 2016, the trial court issued its Order, terminating Mother's parental rights. The trial court concluded, in relevant part, that there is a reasonable probability that the

conditions which resulted in the Children's removal and continued placement outside the home will not be remedied; that continuation of the parent-child relationship poses a threat to the Children's well-being; and that termination of the parent-child relationship is in the best interests of the Children.

Mother now appeals. Additional facts will be provided as necessary.

## DISCUSSION AND DECISION

Mother challenges the termination of her parental rights to A.G. and T.G. Our courts have long recognized that "the parent-child relationship is 'one of the most valued relationships of our culture.'" *In re D.P.*, 994 N.E.2d 1228, 1231 (Ind. Ct. App. 2013) (quoting *Bester v. Lake Cnty. Office of Family & Children*, 839 N.E.2d 143, 145 (Ind. 2005)). In fact, "[a] parent's interest in the care, custody and control of his or her children is 'perhaps the oldest of the fundamental liberty interests.'" *In re G.Y.*, 904 N.E.2d 1257, 1259 (Ind. 2009) (quoting *Troxel v. Granville*, 530 U.S. 57, 65 (2000)). Accordingly, the Fourteenth Amendment to the United States Constitution safeguards "the traditional right of a parent to establish a home and raise his child." *In re D.P.*, 994 N.E.2d at 1231. Notwithstanding this constitutional protection, parental rights are not absolute; rather, they "must be subordinated to the child's interests" and may be terminated if the parents are "unable or unwilling to meet their parental responsibilities." *In re G.Y.*, 904 N.E.2d at 1259-60. On appeal, we are mindful of the fact that "[t]he involuntary termination of parental rights is the most extreme measure that a court can impose and is designated only as a last resort

when all other reasonable efforts have failed." *In re N.Q.*, 996 N.E.2d 385, 391 (Ind. Ct. App. 2013).

[18] Ultimately, the purpose of terminating parental rights is to protect the children involved, not to punish the parents. *In re D.L.*, 814 N.E.2d 1022, 1027 (Ind. Ct. App. 2004), *trans. denied*. As such, a court is not required to wait "until children are irreversibly influenced by a deficient lifestyle such that their physical, mental, and social growth are permanently impaired before terminating the parent-child relationship." *Id.* "When the evidence shows that the emotional and physical development of a [CHINS] is threatened, termination of the parent-child relationship is appropriate." *Id.*

[19] When reviewing the termination of a parent's rights, our court does not reweigh evidence or assess the credibility of witnesses. *In re G.Y.*, 904 N.E.2d at 1260. We will consider "only the evidence and reasonable inferences that are most favorable to the judgment." *Id.* In addition, the trial court issued findings of fact and conclusions thereon in terminating Mother's parental rights. Thus, we will "not set aside the findings or judgment unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses." Ind. Trial Rule 52(A). In determining whether the trial court has clearly erred, we apply a well-established, two-tiered standard of review. "First, we determine whether the evidence supports the findings, and second we determine whether the findings support the judgment." *In re G.Y.*, 904 N.E.2d at 1260. "A judgment is 'clearly erroneous if the findings do not support the

trial court's conclusions or the conclusions do not support the judgment.'" *Id.* (quoting *Bester*, 839 N.E.2d at 147).

[20] In order to terminate a parent's rights to his or her child, DCS must prove, in relevant part:

> (A) that one (1) of the following is true:
>
> > (i)  The child has been removed from the parent for at least six (6) months under a dispositional decree.
>
> > \* \* \* \*
>
> (B) that one (1) of the following is true:
>
> > (i)  There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.
>
> > (ii)  There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.
>
> > \* \* \* \*
>
> (C) that termination is in the best interests of the child; and
>
> (D) that there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2). DCS must establish each element by clear and convincing evidence. I.C. § 31-37-14-2. "Clear and convincing evidence need not reveal that 'the continued custody of the parent is wholly inadequate for the child's very survival.' Rather, it is sufficient to show by clear and convincing evidence that 'the child's emotional and physical development are threatened' by the respondent parent's custody." *In re G.Y.*, 904 N.E.2d at 1261 (citation omitted) (quoting *Bester*, 839 N.E.2d at 148).

[21] In this case, Mother does not contend that DCS failed to prove that the Children have been removed for the requisite time, that termination is in the Children's best interests, or that there is a satisfactory plan in place for the Children's care. Rather, Mother's sole contention on appeal is that there is insufficient evidence to support the trial court's determination that there is either a reasonable probability that the conditions resulting in the Children's removal and continued placement outside the home will not be remedied or that the continuation of the parent-child relationship poses a threat to the Children's well-being.[4]

[22] When determining whether there is a reasonable probability that conditions will not be remedied, "a trial court must judge the parent's fitness to care for his or

---

[4] Mother has waived any argument regarding whether the continuation of the parent-child relationship poses a threat to the Children's well-being by failing to develop a cogent argument supported with citations to authority. *See* Ind. Appellate Rule 46(A)(8)(a). Because we find sufficient evidence supports the trial court's determination that there is a reasonable probability that conditions will not be remedied, we would not have addressed whether the continuation of the parent-child relationship poses a threat to the Children's well-being regardless. *See K.T.K. v. Ind. Dep't of Child Servs.*, 989 N.E.2d 1225, 1231 (Ind. 2013).

her child at the time of the termination hearing, taking into consideration evidence of changed conditions." *S.L. v. Ind. Dep't of Child Servs.*, 997 N.E.2d 1114, 1123 (Ind. Ct. App. 2013). It is important to note that "[t]he statute does not simply focus on the initial basis for a child's removal for purposes of determining whether a parent's rights should be terminated, but also those bases resulting in the continued placement outside the home." *In re N.Q.*, 996 N.E.2d at 392 (internal quotation marks omitted). The trial court should "evaluate the parent's habitual patterns of conduct to determine whether there is a substantial probability of future neglect or deprivation of the child." *S.L.*, 997 N.E.2d at 1123. The trial court may take into consideration "evidence of a parent's prior criminal history, drug and alcohol abuse, history of neglect, failure to provide support, and lack of adequate housing and employment." *In re N.Q.*, 996 N.E.2d at 392. Additionally, the trial court may "reasonably consider the services offered by the [DCS] to the parent and the parent's response to those services." *Id.* (alteration in original). DCS need only establish "that there is a reasonable probability that the parent's behavior will not change." *Id.*

[23] In this case, the trial court made numerous findings in support of its determination that the conditions resulting in the Children's removal and continued placement outside of the home will not be remedied. On appeal, Mother challenges only the following five findings:

> 36. Parents cannot properly, adequately or safely parent the [C]hildren while maintaining a lifestyle that includes the use of controlled substances, including but not limited to methamphetamine and marijuana.

37. The [C]hildren have suffered trauma from a long history of abuse and neglect, at the hands of their parents, and would be very seriously re-traumatized by reuniting with their parents.

38. The [C]hildren's well-being would be seriously and permanently threatened if they were to be returned to their parents, whether immediately or at any time in the future.

\* \* \* \*

40. The [C]hildren have been outside of their parents['] care and custody for nineteen (19) months. During that time, they have become settled, stable and attached to their foster parents in their current home, and have grown to trust their current family. Removing them from that environment to return them to the same parents that caused them trauma originally, would be extraordinarily harmful to the [C]hildren.

41. Whatever recent attempts by parents to begin to address the reasons for removal, come far too late to benefit these [C]hildren.

(Appellant's App. p. 32).

[24] According to Mother, these findings "are not findings of fact but are rather conclusions of law without being supported by clear and convincing evidence. No factual situation pertaining to [Mother] are set forth to justify these conclusions." (Appellant's Br. pp. 9-10). More specifically, Mother argues that "[t]here is nothing to show any nexus between [Mother's] drug usage and any negative impact on her [C]hildren." (Appellant's Br. p. 8). She also posits that

there is no evidence establishing that she "abused or neglected any of the [C]hildren's needs." (Appellant's Br. pp. 8-9). Mother additionally asserts that the "[e]vidence presented at the hearing indicated she had come a long way in dealing with her drug problem. She had clean screens on [fifty-three] of [fifty-seven] drug screens which clearly shows she was attempting to deal with her drug problem. Further she testified to the fact that she was now employed and had rented a suitable house in Dana, Indiana." (Appellant's Br. p. 9).

[25]    We find no merit in Mother's arguments. It is clear from the record that the Children were removed from Mother's custody due to her pervasive substance abuse, and they remained in foster care because she refused to take the necessary steps to achieve sobriety and independence (*i.e.*, housing, employment, and transportation). Despite the efforts of DCS and the court to assist and motivate Mother, she failed to avail herself of the services offered. In fact, Mother never attended more than a few counseling sessions, and she declined to follow up with recommended treatment. Mother failed drug screens throughout the case, and she largely refused to accept responsibility for her actions—claiming instead that someone must have slipped methamphetamine into her drinks, that her medications were causing false positives, and that she inadvertently ate marijuana-infused brownies. Mother put her home-based case management services on hold because "she was too stressed out for services"; yet, she failed to take advantage of opportunities that may have eased her stressors, such as obtaining her GED or completing her CNA certification to obtain gainful employment and suitable housing. (Tr. p. 255). Mother failed to

maintain her visitation schedule with the Children, who were already suffering from a lack of stability. Finally, Mother absconded from drug court and all other services for three months.

[26] Moreover, the trial court's additional findings, which Mother has not challenged, further establish that Mother's behavior is not likely to change:

> 10. Mother has tested positive for methamphetamine dozens of times throughout the case, and has also tested positive for marijuana several times.
>
> 11. Mother has gone periods of weeks or months without using, but shows a consistent pattern of returning to drug abuse after a time.
>
> 12. Mother denies recent drug abuse despite the overwhelming and reliable scientific proof of such drug abuse.
>
> 13. Mother has taken methamphetamine recently, even within days of the final part of the fact finding in this matter and even after the first day of the fact finding in this matter.
>
> 14. Mother has smoked marijuana while this matter was pending, despite knowing that this matter was filed and set for fact finding, and that her parental rights hung in the balance.
>
> 15. Mother has lied to the [c]ourt about participating in drug treatment in Illinois.
>
> 16. Mother has forced this [c]ourt to suspend visitation due to her lack of compliance with court ordered services. In

early 2015, after Mother had been particularly noncompliant, the [c]ourt set up [a] review hearing for every two weeks in an attempt to increase supervision and improve drug treatment compliance. The goal being that clean drug screens would be rewarded with increased visitation . . . . It appears that Mother appeared at one such hearing then absconded from all services and court-ordered requirements as further described below.

17.    Mother has forced this [c]ourt, on two occasions, to issue warrants for her arrest for her lack of compliance in the underlying CHINS matter.

18.    For three (3) months, from March to June, 2015, [M]other's whereabouts were unknown to this [c]ourt or DCS. During this time[,] she made no efforts to request this [c]ourt to revisit its order ending her visitation with her [C]hildren.

19.    Mother had never adequately addressed her drug abuse, continues to use drugs, and is not likely to gain sobriety in the near future. After she absconded from services, she fabricated a tale that she had received numerous services in Illinois, but was unable to provide any proof of the same. In fact, DCS caseworkers attempted to obtain treatment records for Mother, but found that Mother had never actually received any services from the providers she named. Although Mother may love her [C]hildren, it is clear she lacks the motivation and/or ability to adequately deal with her addiction.

(Appellant's App. pp. 30-31).

[27] As to Mother's contention that there is no nexus between her drug usage and a negative impact on the Children, we disagree. While it is true that there is no evidence that the Children had inadequate shelter, food, clothing, or personal care while in Mother's custody, Mother and the Children were living with Maternal Grandmother at the time. Thus, Maternal Grandmother served as a "safety net" to ensure the Children were receiving proper care. (Tr. p. 350). At the termination hearing, the Children's therapist testified that the Children—A.G. in particular—have exhibited indices of trauma, such as being fearful and anxious. Contrary to Mother's assertion that her substance abuse has not affected her ability to properly parent, the Children's therapist explained that Mother's drug use "would lead to the home being unstable and certain things being neglected." (Tr. p. 178). Furthermore, Mother ignores the fact that her illicit drug use puts her at risk for criminal liability, which would, once again, leave the Children without a suitable caregiver.

[28] Mother also contends that the trial court "failed to take into consideration the evidence of changed conditions which is required." (Appellant's Br. p. 9). Approximately two months before the termination hearing, Mother rented a two-bedroom house, and she obtained employment. At the termination hearing, Mother claimed that she was no longer abusing drugs and that she was in a position to care for the Children. She testified that she

> would be there to help [the Children] with their homework, take care of them. I work so I can pay all my bills. I ain't gonna rely on no government to help me. And just buy their clothes, do

their sports activities they want to do. Spend quality time together. Make pallets on the floor like we use to.

(Tr. pp. 112-13). We find that it was well within the discretion of the trial court "to 'disregard the efforts Mother made only shortly before termination and to weigh more heavily Mother's history of conduct prior to those efforts.'" *K.T.K.*, 989 N.E.2d at 1234. Moreover, "[w]here there are only temporary improvements and the pattern of conduct shows no overall progress, the court might reasonably find that under the circumstances, the problematic situation will not improve." *In re N.Q.*, 996 N.E.2d at 392 (alteration in original). Here, the fact that Mother continued to test positive for methamphetamine even at the time of the termination hearing demonstrates that she has not remedied the conditions which resulted in the Children's removal and continued placement outside the home.

## CONCLUSION

Based on the foregoing, we conclude that the trial court's Order is not clearly erroneous because there is clear and convincing evidence to support the termination of Mother's parental rights.

Affirmed.

Bailey, J. and Barnes, J. concur